United States Bankruptcy Court
Eastern District Of Washington

In Re:

JAMES W. WALLACE, JR.

Main Case Number: 04-08560

Debtor(s).

**MEMORANDUM OPINION**

James W. Wallace Jr. seeks confirmation of his Chapter 11 plan. It is the fifth plan filed by Debtor in the case. Those creditors voting have accepted it. The matter comes before the court for an unopposed confirmation hearing. This court must decide if the proposed plan complies with the applicable statutory provisions and should be confirmed.

### I. JURISDICTION.

This matter is a case under Title 11 of the United States Code. This court has jurisdiction pursuant to 28 U.S.C. §157. The United States District Court for the Eastern District of Washington has referred these matters to this court. Local Rules U.S. District Court Eastern District of Washington LR 83.5 (a)(1).

### II. ISSUE.

Does the debtor's proposed plan meet the best interest of the creditors test provided in 11 U.S.C. 1129(a)(7)?

### III. FACTS.

James W. Wallace Jr. filed a Chapter 11 case on November 11, 2004. In his initial bankruptcy schedules, he listed real property valued at $2,654,937.00 and personal property valued at $804,959.00. He scheduled his secured debt as $1,827,127.04, unsecured debt as $355,161.00, and priority debt as unknown. Later, he amended his schedules to substantially increase the value of his personal property from $804,759.00 to $3,401,680.57

and to state the amount of priority tax debt as $367,804.88. For the purposes of the court's analysis, the significance of these figures is that Mr. Wallace is, by a substantial margin, a solvent debtor.

This has been a troubled case, marked by difficulty in obtaining counsel, motions to prohibit use of cash collateral, motions to dismiss or appoint a trustee, contested evidentiary hearings, stay relief motions, appointment of an examiner, the filing of a creditor plan, and multiple debtor plans, ultimately culminating in the Debtor's Fifth Amended Plan.

The plan before the court is a liquidation plan that permits the debtor to sell assets over a period of time and, thereafter, requires the debtor to auction off his remaining assets. Proceeds from the sale of secured assets are to be distributed in the usual manner to the secured creditors in the priority of their interests in the collateral. Proceeds from the sale of unsecured assets, however are to be distributed in an unusual manner to general unsecured creditors and two secured creditors, who will share **pari passu** with unsecured creditors. The two secured creditors are Key Bank and Tower Investments, Inc. (Tower), who hold inferior mortgages on some of the debtor's real estate. If the unsecured creditors are not paid in full from the proceeds of unsecured assets, an event undoubtedly made more likely by the distributions to Key Bank and Tower, the plan preserves for them the secured creditor's junior lien positions in some of the debtor's real estate.

This plan was mailed to all creditors with appropriate notice and ballots. With one exception, each creditors class accepted the plan. The one exception has since amended its vote and accepted the plan. At the uncontested confirmation hearing, the court was urged to approve the plan by the debtor and Tower, the only creditor in attendance.

The Debtor's List Classifying Claims identifies ten unsecured creditors in Class 10 holding a total of $280,805.00. Of these ten, three voted to accept the Debtor's plan; the remaining seven did not vote. The claims of the three accepting creditors total $132,829.00. The largest creditor in this class, Key Bank, holds a claim of $119,757.00 and voted in favor of the plan. Key Bank also holds a lien in second place, behind the first mortgage of $152,480.00 on the Debtor's residence.

The Debtor's largest unencumbered asset is his stock in Westcoast Broadcasting, which the Debtor listed in his amended schedules at a value of $2,000,000.00. The Debtor has moved for an order authorizing the sale of the radio station stock for $4,500,000.00. The court was advised at the confirmation hearing that this sale will net to the Debtor's estate approximately $1,200,000.00 after payment of capital gains taxes. The court was further advised that it would take around three more months to complete the sale process.

If this proposed sale closes, it would generate enough funds to pay off the more than $700,000.00 of priority and general unsecured claims plus the $180,153.00 undersecured portion of Tower Investments' class 3 claim. The Plan proposes, however, that Tower's secured portion of its class 3 claim of $250,000.00 also shares in the distribution of unencumbered assets, share and share alike, with the unsecured creditors. Likewise, Key Bank would share as an unsecured creditor for its second mortgage debt on Debtor's residence in the sum of $108,561.00. These figures total up in excess of the $1,200,000.00 projected net sale proceeds, making no allowance for payment of costs of administration which would be paid prior to these creditors. The Plan proposes to compensate the general unsecured creditors for the dilution of their distribution from the unencumbered assets of the Debtor, by preserving Key Bank's and Tower's second position liens in the various encumbered assets after Key Bank and Tower Investments are paid off.

The Debtor's Plan also provides for distribution of the Debtor's share of the sale proceeds from the Kayak Lake real estate. This real estate was held in the estate of Helen D. Wallace. The Debtor was a beneficiary of that estate. The property was sold and the Debtor's share was $40,000.00. By agreed order signed by Key Bank and the Debtor, those proceeds were deposited in an account which restricted Debtor's access to these monies. The Debtor in his plan proposes to divide these funds after payment of the capital gains taxes, between Class 1, the priority tax creditors, and Class 3, Tower's undersecured and unsecured claims. Tower admittedly has no lien in these funds.

## IV. DISCUSSION

### A. THE BEST INTERESTS TEST

Tower, Key Bank, and the debtor have asked the court to confirm the plan. Before the court may confirm the plan, the court must ensure that the plan satisfies all of the code requirements for confirmation. In re Ambanc La Mesa, Ltd., 115 F.3d 650, 653 (9th Cir. 1997). This includes a finding by the court that unsecured creditors would receive under the plan at least what they would receive in a chapter 7 liquidation.

The statutory confirmation provision which is at issue in this case is 11 U.S.C. §1129(a)(7) which provides in part:

> (7) With respect to each impaired class of claims or interests –
>     (A) each holder of a claim or interest of such class –
>         (I) has accepted the plan; or
>         (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or
>
> . . .

This is known as the best interests of creditors test. ". . . [U]nder the best interests test, where not all creditors support the Plan, the debtor must prove that the creditors would receive as much under the Plan as they would receive in a liquidation under Chapter 7 . . . " . In re Ambanc La Mesa, Ltd., 115 F.3d at 657. This requires a specific finding. Ibid.

The Debtor, Key Bank and Tower in their respective memorandums filed in support of confirmation all rely on the fact that all classes of claims have now accepted the Plan. This however does not resolve the issue. Of the ten general unsecured creditors listed in Debtor's List Classifying Claims only three creditors voted in favor of the plan. The remaining seven did not vote. The failure to vote on confirmation is not equivalent to acceptance of a plan. In re Long Arabians, 103 B.R. 211, 215 (9th Cir. BAP 1989). The court must apply the best interests test as to these non-voting creditors. In re Consolidated Water Utilities Inc., 217 B.R. 588, 592 (9th Cir. BAP 1998).

## B. CLAIMS ANALYSIS[1]

The Debtor's Plan provides that the unencumbered assets will be distributed to the general unsecured creditors (Class 10), Tower (Class 3) and Key Bank (Class 7) in proportion to each creditor's claim. Both Tower and Key Bank have collateral securing these claims, but their respective priority positions in that collateral are not in first place. The Plan provides that Tower and Key Bank will retain their lien positions in their respective collateral as well as share in the distribution from the unencumbered assets. The best interest test requires the court to look at the economic realities of these provisions. This requires that the court consider the expenses and classes of claims entitled to be paid from the Debtor's unencumbered assets pursuant to his Plan.

### 1. Administrative Expenses.

The court has been provided no information regarding the unpaid costs of administration in this case. The docket in the case reveals that the Debtor's attorney, Patrick Morrissey has been paid $40,376.61 for services rendered between January 10, 2005 to February 13, 2006. It also appears that Jeffrey Neher was appointed as accountant for the Debtor on September 18, 2005. The docket in the case does not indicate that Mr. Neher has ever made an application for fees since that date. There has been substantial legal activity by Debtor's counsel since February 13, 2006. The court anticipates a substantial additional request for Debtor's attorney fees and accountant fees to be made by the professionals. The court is hesitant to speculate as to the amounts of these requests. The plan provides the administrative expenses are to be paid as soon as applications have been approved by the court and funds are available.

### 2. Class 1 Priority Claims.

Debtor's Plan reveals that there are two creditors entitled to priority payment as tax

---

[1] The figures used in section "B. Claims Analysis" for the amounts of claim and the value of the collateral were taken from Debtor's "Plan of Reorganization - Fifth Amended", Debtor's "Disclosure Statement - Second Amended", and Debtor's "Supplement to Debtor's Approved Disclosure Statement - First Amended".

claimants, the Internal Revenue Service, whose claim is $280,494.84, and the Washington State Department of Revenue, whose claim is $51,304.88. The Debtor's Fifth Amended Plan makes no provision for payment of interest on these priority claims. Debtor's "Supplement to Debtor's Approved Disclosure Statement First" provides that the Internal Revenue Service claim shall bear interest at the rate specified in 26 U.S.C. §6621 (I.R.C. §6621). There is no provision in the Debtor's Plan for payment of interest on the Department of Revenue's claim.

3. Tower (Class 3).

Debtor's Fifth Amended Plan provides that Tower (Class 3) is owed $430,153.00 secured by a deed of trust on five parcels of real property.

The first parcel secured by Tower's deed of trust is the KPQ Building. This parcel is valued at $775,000.00. The KPQ Building is subject to a first lien in favor of Key Bank (Class 6) in the amount of $756,019.00 plus interest. Tower's second lien in this property is valued at $0.00.

The second parcel secured by Tower's deed of trust is the Wash Works Building. It is valued at $360,000.00. It is subject to a first lien in favor of Dwight and Paula Cash in the amount of $170,554.84 plus interest. ($216,534.00 Exhibit 1). Tower's second lien in this property is valued at $125,000.00. ($113,466.00 Exhibit 1). [2]

The third parcel of Tower's collateral is the Sign-Pro Building, valued at $245,000.00. It is subject to a first lien in favor of Thomas and Judy Green in the sum of $89,489.00 plus interest. Tower's second lien on this property is valued at $100,000.00.

The fourth parcel of Tower's collateral is the Debtor's residence valued at $260,000.00. This property is subject to a first lien in favor of Southern Pacific Funding Corporation in the amount of $152,480.00. A second lien in favor of Key Bank is in the sum of $108,561.00. Tower's third lien on this property is valued at $0.00.

The fifth parcel of Tower's collateral is the KPQ Ranch valued at $242,000.00. This is subject to a first lien (Claim # 4) in favor of Washington Trust (since assigned to Tower) in

---

[2] Exhibit 1 was introduced at the confirmation hearing.

Memorandum Opinion
January 29, 2007                              6

04-08560-JAR11    Doc 352    Filed 01/29/07    Entered 01/30/07 15:10:42    Pg 6 of 19

the sum of $177,754.00 plus interest. Tower holds a second lien in this property which is valued at $25,000.00.

It thus appears that the secured portion of Tower's Claim # 3 is $250,000.00 pursuant to the figures used in the Supplement to Debtor's Approved Disclosure Statement-First and $180,153.00 unsecured.

4. <u>Key Bank (Class 7)</u>.

Key Bank has a second priority lien in the Debtor's residence. The residence is valued at $260,000.00. The first lien is in favor of Southern Pacific Funding Co. in the sum of $152,480.00. Key Bank has a second deed of trust on this property in the approximate amount of $108,561.00.

5. <u>General Unsecured Claims</u> (Class 10).

There are ten claimants in this class whose claims total $280,805.00.

C. THE PLAN - DISTRIBUTION OF UNENCUMBERED ASSETS.

Analysis of the Debtor's unencumbered property reflects the following:

| | |
|---|---:|
| Debtor's share of sale of Westcoast Broadcasting Inc. stock share | $1,250,000.00 |
| Debtor's Kayak Lake sale proceeds | 40,000.00 |
| Quincy Real Property | 24,900.00 |
| | $1,314,900.00 |

The Debtor's Plan provides for special treatment of the $40,000.00 proceeds of the Kayak Lake property. These proceeds are to be divided $16,800.00 to the Internal Revenue Service, $3,200.00 to the Department of Revenue (Class 1 priority tax claimants) and $20,000.00 to Tower (Class 3). Tower has no lien on the Kayak Lake property or its proceeds.

Thus from the $1,314,900.00 proceeds of Debtor's unencumbered assets we subtract $40,000.00. This reduces the proceeds down to $1,274,900.00.

Before payment of the Kayak Lake sale proceeds, the priority tax claimants' claims are as follows:

Memorandum Opinion
January 29, 2007                                              7

| Claims | Date of Filing 11/22/04 | Tax rate[3] | % to 11/22/06 | Total claim 11/22/06 | Per diem |
|---|---|---|---|---|---|
| IRS | $280,494.84 | 7% | $39,269.28 | $319,764.12 | $53.79 |
| Dept of Revenue | $ 51,304.88 | 6% | $ 6,156.60 | $ 57,461.48 | $ 8.43 |
| | $331,799.72 | | | $377,225.60 | |

After application of $20,000.00 of the Kayak Lake sale proceeds (IRS $16,800; Dept of Revenue $3,200.00) to the priority tax claimants claims they are owed the following:

| Claimant | Adjusted Claim |
|---|---|
| IRS | $302,964.12 + % from 11/22/06 |
| Dept of Revenue | $ 54,261.48 + % from 11/22/06 |
| | $357,225.60 |

The $357,225.60 of priority tax claims plus an undetermined allowance for costs of administration are now to be paid from the balance of unencumbered assets remaining, $1,274,900.00. ($1,314,900.00 - $40,000.00 = $1,274,900.00). This would leave less than $917,674.40 ($1,274,900.00 - $357,225.60 minus costs of administration minus interest from 11/22/06 to date of payment) to be paid to Tower (Class 3), Key Bank (Class 7) and the general unsecured creditors (Class 10).

Tower's claim is calculated as follows:

| Claimant | Debt date of filing 11/22/04 | % rate[4] | % due as of 11/22/06 | Total Claim 11/22/06 | Per Diem |
|---|---|---|---|---|---|
| Tower (Class 3) | $430,153.00 | 14% | $120,442.84 | $550,595.84 | $164.99 |

---

[3] Priority Claimants Interest Calculation Summary
IRS RATE: I.R.C. § 661 states that the underpayment rate is the federal short-term rate rounded to the nearest full percent + 3 percentage points. The Court averaged the federal short-term rate for the period of 11/04 - 11/06 which equals 4%, and then added the 3 percentage points for a total of 7%. DEPT OF REVENUE RATE: RCW 82.32.050 states that the rate of interest to be charged shall be an average of the federal short-term rate + 2 percentage points. The Court averaged the federal short-term rate for the period of 11/04 - 11/06 which equals 4%, and then added the 2 percentage points for a total of 6%.

[4]The Debtor's Plan provides that the Tower claim shall bear interest at 14% per annum until the effective date of the Plan.

04-08560-JAR11   Doc 352   Filed 01/29/07   Entered 01/30/07 15:10:42   Pg 8 of 19

This total claim is reduced by Tower's $20,000.00 share of the Kayak Lake sale. Thus its total claim is reduced to $530,595.84.

The other two claimants sharing in the unencumbered assets of the Debtor's claims bear interest at different rates:

| Claimant | Interest rate[5] | % due as of 11/22/06 | per diem thereafter |
|---|---|---|---|
| Key Bank (Class # 7) | 9.25% | $ 20,083.79 | $ 27.51 |
| General Unsecured (Class # 10) | 7.25% | $ 40,716.73 | $ 55.78 |

Therefore, the total claims against the remaining unencumbered proceeds are as follows:

| Claim | Date of filing 11/22/04 | % to 11/22/06 | Total claim 11/22/06 |
|---|---|---|---|
| # 3 Tower | $430,153.00 + | $100,442.84 = | $530,595.84 |
| #7 Key Bank | $108,561.00 + | $ 20,083.79 = | $128,644.79 |
| #10 General unsecured | $280,805.00 + | $ 40,716.73 = | $321,521.73 |
| | | | $980,762.36 |

The funds remaining to be distributed to these three classes of claims is $917,674.40, less costs of administration and less interest from 11/22/06 to payment.

The Plan provides that general unsecured claims, to the extent they are not paid in full with interest are to be entitled to Tower's (Class 3) and Key Bank's (Class 7) respective lien positions after Tower and Key Bank are paid in full.

Under the Plan the three classes are entitled to distribution in proportion to their claims. This breaks down to the following distribution percentages to the class of claims:

---

[5] The Debtor's Plan provides that the Key Bank claim shall bear interest at Key Bank's prime interest rate plus 2%. As of January 2, 2007, this calculates to 9.25%. Debtor's Plan provides that the general unsecured creditors will bear interest at Key Bank's prime interest rate, 7.25% as of January 2, 2007.

Memorandum Opinion
January 29, 2007        9

04-08560-JAR11    Doc 352    Filed 01/29/07    Entered 01/30/07 15:10:42    Pg 9 of 19

| Claim | Percent of each Distribution |
|---|---|
| # 3 Tower | 54.1 % |
| # 7 Key Bank | 13.12% |
| # 10 Unsecured | 32.78% |

The Court must determine how this treatment of the general unsecured claims compares with the treatment they would receive in a Chapter 7 liquidation.

### D. DISTRIBUTION OF UNENCUMBERED ASSETS- CHAPTER 7.

Comparison of the treatment of the claims of the general unsecured creditors under the Debtor's Plan with their treatment under a chapter 7 liquidation requires analysis of the undersecured claims of Tower and Key Bank.

The "Supplement to Debtor's Approved Disclosure Statement–First Amended" indicates that $180,153.00 of Tower's class 3 claim is to be treated as a general unsecured claim and $250,000.00 as secured.

Key Bank's class 7 claim is a second mortgage in the sum of $108,561.00, plus interest, on the Debtor's residence. The first mortgage is held by Southern Pacific Funding Company in the sum of $152,480.00, plus interest. These secured debts total $261,041.00, plus interest. At confirmation the residence was valued at $260,000.00. Key Bank's second lien position on this property appears only slightly undersecured.

Thus, in a chapter 7 liquidation, the creditors entitled to treatment as unsecured creditors would be:

| Claimant | Amount | Percent of each distribution until paid |
|---|---|---|
| Tower | $180,153.00 | 39.08% |
| General Unsecured Creditors (class 10) | $280,805.00 | 60.92% |
| | $460,958.00 | |

The unencumbered assets available for distribution to the unsecured creditors total

Memorandum Opinion
January 29, 2007                    10

$1,314,900.00.[6]

These assets are to be distributed pursuant to the terms of 11 U.S.C. § 726, which in turn references the priorities proscribed in 11 U.S.C. § 507. Applying those rules to the facts of this case, the following categories are to be paid in the following order:

1. Administration expenses (§ 507(a)(1); § 726(a)(1)). These would include fees charged by Debtor's attorney and accountant. In this case, these costs have yet to be applied for or approved, but are likely to be substantial.

2. Taxes (§507(a)(8); § 726(a)(1)). The tax claim of the IRS is $280,494.84 as of the date of filing (November 22, 2004) and of the Washington State Department of Revenue $51,304.88, also as of the date of filing, for a total of priority tax claims of $331,799.72.

3. Unsecured claims (§726(a)(2)). These are the $180,153.00 unsecured portion of Tower's class 3 claim and the $280,805.00 of the class 10 claim for a total of $460,958.00.

4. Interest (§727(a)(5)). This is interest at the legal rate from the date of filing.

5. The Debtor (§ 727(a)(6)).

Before doing any further calculation, it is necessary to arrive at a figure to be paid as interest on these claims. The Ninth Circuit in the case of In re Cardellucci, 285 F.3d 1231 (9th Cir. 2002) has ruled that a single rate of interest should be applied, based on the federal statutory rate pursuant to 28 U.S.C. § 1961(a). This rate is the rate charged under "U.S. Government Securities - Treasury Constant Maturities - 1 Year." This rate as of December 29, 2006, was 5%.

---

[6] C. THE PLAN - DISTRIBUTION OF UNENCUMBERED ASSETS.
Analysis of the Debtor's unencumbered property reflects the following:
| | |
|---|---|
| Debtor's share of sale of Westcoast Broadcasting Inc. Stock share | $1,250,000.00 |
| Debtor's Kayak Lake sale proceeds | 40,000.00 |
| Quincy Real Property | 24,900.00 |
| | $1,314,900.00 |

Memorandum Opinion
January 29, 2007                    11

This 5% rate is charged on the following claims:

1. Taxes $331.799.72
2. Unsecured $460,958.00
$792,757.72

Interest on this figure at 5% is $39,637.89 per year or $79,275.77 as of November 22, 2006 (2 years post filing).

Thus, starting with unencumbered assets of $1,314.900.00, subtracting $200,000.00 costs of administration[7], the $792,757.72 claims total and the interest due $79,275.77, yields a balance of $242,866.51.

Applying this analysis, the general unsecured claims are paid in full with interest on their claims at 5% in a chapter 7 liquidation solely from the unencumbered assets.

### E. COMPARISON OF UNSECURED CREDITORS TREATMENT BETWEEN DEBTOR'S PLAN AND A CHAPTER 7 LIQUIDATION.

Having considered how the unsecured creditors (Class 10) would fare under Debtor's Plan and a Chapter 7 liquidation, the court must decide if this class of creditors is receiving as much under the Debtor's Plan as they would in a liquidation under Chapter 7. Arguably if all goes as projected by the Debtor, the Class 10 creditors will receive as much or more under the Debtor's Plan. The court must decide if that is probable under the facts of this case.

1. Interest Rate Impact.

The Debtor's Plan provisions allowing interest to be paid on unsecured claims at various rates has a significant impact on the chances of the Class 10 claims being paid in full. Tower's Class 3 claim is an under-secured claim. As a consequence it would not be entitled to interest at the contract rate of 14% as allowed in the Plan (11 U.S.C. §506(b)). Computation of interest at 14% over a two year period increases the amount to be paid on Tower's claim by

---

[7] This estimate includes allowance for Chapter 7 professionals and trustee and unpaid Chapter 11 costs of administration.

Memorandum Opinion
January 29, 2007           12

$77,427.54.[8] This of course increases Tower's share of the distribution of unencumbered assets at the expense of the Class 10 unsecured creditors under the Debtor's Plan.

Key Bank's Class 7 claim is to bear interest under the Debtor's Plan at 9 1/4%. The Debtor's residence is valued at $260,000.00, slightly less than the combined claims against it, $261,041.00. Thus as an under-secured creditor Key Bank would not be entitled to interest on its claim at the contract rate but rather at the federal judgment rate 5%. This would reduce the interest on Key Bank's claim, for the period November 11, 2004 to November 11, 2006 from $20,083.79 to $10,856.10. Computation at the higher rate increases Key Bank's share of the distribution of unencumbered assets at the expense of the Class 10 unsecured creditors.

2. <u>Treatment of Tower's & Key Bank's Secured Claims</u>.

Tower's Class 3 claim includes a secured portion of $250,000.00 and an unsecured portion of $180,153.00. Debtor's Plan provides that Tower's entire claim of $430,153.00 be treated as an unsecured claim for purposes of distribution of the Debtor's unencumbered assets. Likewise the Debtor's Plan treats Key Bank's Class 7 claim as an unsecured claim for purposes of distribution of Debtor's unencumbered assets. Key Bank's Class 7 claim for $108,561.00 is fully secured, or close to it, by a second mortgage on Debtor's residence.

This also increases Tower's and Key Bank's share of the Debtor's unencumbered property at the expense of Class 10.

3. <u>Distribution - Plan v. Chapter 7</u>.

The difference in treatment under the Debtor's Plan from the Chapter 7 liquidation priority scheme yields these differences in distribution of unencumbered asset proceeds:

\*\*

\*\*

---

[8] Two years interest at 14% on $430,153.00 is $120,442.84. Two years interest at 5% based on the federal judgment rate (28 U.S.C. §1961(a)) is $43,015.30 ($120,442.84 - $43,015.30 = $77,427.54.

Memorandum Opinion
January 29, 2007                13

| Claimant | % per Plan | Chapter 7 |
|---|---|---|
| Tower (Class 3) | 54.1% | 39.08% |
| Key Bank (Class 7) | 13.13% | 0% |
| General Unsecureds (Class 10) | 32.78% | 60.92% |

As we have seen in our analysis of the distribution under the Debtor's Plan, there will be a shortfall in paying all of Class 3, 7 and 10 claims from the available unencumbered assets. This appears to be in the range of $63,000.00 plus allowance of future costs of administration and interest; it could be as high as $100,000.00 or more.

As to the amounts remaining unpaid to Tower and Key Bank, these amounts are secured by the respective creditors' liens in the various items of their collateral. As to the amount unpaid to the Class 10 unsecured creditors, Class 10 will be secured by existing liens held by Tower and Key Bank, but entitled to payment as a result of these liens only after Tower and/or Key Bank have been paid off in full.

Under a Chapter 7 liquidation the Class 10 creditors would be paid in full plus interest at the federal judgment rate of 5% from Debtor's unencumbered assets. Under Debtor's Plan Class 10 would not be paid in full plus interest at 7.25% from the Debtor's unencumbered assets. The shortfall would be secured by inferior lien positions behind Tower' and Key Bank's Class 3 and 7 claims. Is the additional $12,636.23 (7.25% compared to 5%) of interest over two years on Class 10 claims secured by subordinate liens the equivalent of having their claims paid in full plus 5%? This requires analysis of the lien position in the various items of Debtor's assets secured by Class 3, 7 and 10 creditors.

    4. Class 10's Compensatory Lien.

Debtor's Plan grants Class 10 a lien meant to compensate it for any loss it might incur as a result of sharing the Debtor's unencumbered assets with secured claimants Tower and Key Bank. Is this compensatory lien adequate compensation for the deterioration of Class 10's position? This issue will be first analyzed asset by asset.

    a. The KPQ Building.

The first item of collateral is the KPQ Building. This property is valued at

$775,000.00. Tower is in second position on this property, behind a first lien in favor of Key Bank securing Key Bank's Class 6 claim in the amount of $756,019.00 plus interest. The Supplement values Tower's secured position in this collateral at $0.00. Since Class 10 does not have a compensatory lien in Key Bank's Class 6 collateral, pay down of Class 6 does not give rise to a Class 10 interest in Class 6's lien. Since Key Bank's Class 6 first lien on this property apparently consumes its whole value, Class 10's compensatory lien after Tower's Class 3 second priority interest in the property appears to be of no value.

  b. <u>Debtor's Residence</u>.

  Both Tower's Class 3 claim and Key Bank's Class 7 claims are secured by Debtor's residence. The value of this is $260,000.00. The Debtor's residence is subject to a first lien in favor of Southern Pacific Funding Corp. In the sum of $152,480.00 plus interest; a second lien in favor of Key Bank securing its Class 7 claim in the sum of $108,561.00; and a third lien securing Tower's Class 3 claim which the Supplement values at $0.00. The Debtor's marketing plan does not provide for immediate sale of this property. Debtor's Plan provides that the Debtor will pay down this obligation on Key Bank's Class 7 claim at the rate of $1,065.00 per month with a five year balloon, default of which would result in an auction of the residence. It appears that it would be more than five years before Class 10 could recognize any benefit from the compensatory lien. Class 10's compensatory lien in Tower's Class 3 claim in the residence would appear to have little value to Class 10.

  c. <u>Wash Works</u>.

  The Wash Works property is also collateral for Tower's Class 3 claim. The evidence introduced at the confirmation hearing suggested this property was to be sold for $370,000.00. This would pay off the first lien held by Dwight and Paul Cash (Class 2) and leave $113,466.00 for Tower's second lien on the property. (Exhibit # 1). Tower's Class 3 claim in this property would have to be reduced to below $113,466.00 before Class 10's compensatory lien in Class 3 collateral would have any value.

  d. <u>Sign-Pro Building</u>.

  The Sign-Pro Building is also collateral for Tower's Class 3 claim. Debtor's Fifth

04-08560-JAR11 Doc 352 Filed 01/29/07 Entered 01/30/07 15:10:42 Pg 15 of 19

Amended Plan values this property at $245,000.00. This property is subject to a first lien in favor of Thomas and Jody Green (Class 5) in the sum of $89,489.00, with Tower's Class 3 obligation in second priority. The Supplement to Disclosure values Tower's interest in this property at $100,000.00. Tower's claim in this property would have to be reduced below $100,000.00 before Class 10's compensatory lien would have any value.

e. KPQ Ranch.

Finally Tower's Class 3 claim is secured by KPQ Ranch property. This property was valued in Debtor's Fifth Amended Plan at $242,000.00. Interestingly Tower's Class 4 claim is in first priority on this property in the sum of $177,754.00. Tower's Class 3 claim is in second priority on the property is valued in the Supplement to Disclosure Statement at $25,000.00. Debtor's Plan provides that Tower's Class 4 first lien will continue to be paid pursuant to the terms of the original loan documents until the property sells. Even if the property sells, Class 10's compensatory lien in Tower's Class 3 collateral will have no value until Tower's Class 3 claim is less than $25,000.00, in which case it is still behind Tower's Class 4 first lien on the property.

## F. IS THE DEBTOR'S PLAN IN THE BEST INTERESTS OF CLASS 10?

Does the compensatory lien provide adequate protection for Class 10's treatment? Ultimately these questions must be answered in determining whether the Plan is in the creditor's best interest. Having examined the economics of the proposed compensatory lien, do these provisions provide to Class 10 the equivalent of what it would receive in a Chapter 7 liquidation? Many of the Debtor's Plan provisions appear to diminish the chances that Class 10 claims will receive what it would otherwise receive in Chapter 7.

a. Kayak Lake Sale Proceeds.

Debtor's Plan provides that $20,000.00 of the net proceeds of this sale will go to pay Tower's Class 3 claim, with the remaining $20,000.00 to go to the priority tax creditors. Tower has no lien on these proceeds and no priority claim to them. In a Chapter 7 liquidation all of these proceeds would go to the costs of administration and priority tax claimants.

04-08560-JAR11    Doc 352    Filed 01/29/07    Entered 01/30/07 15:10:42    Pg 16 of 19

Payment on those priority claims would move Class 10 claims closer to ultimate payment. Injecting Tower's payment into the equation, delays and reduces Class 10's chances of getting paid in full.

### b. Discriminatory Treatment of Claims.

Debtor's Plan provides that the secured portion of Tower's and Key Banks' claims share as if they were unsecured with Class 10. As a result of this unequal treatment Tower and Key Bank are able to receive a greater portion of the unencumbered assets than they would otherwise, to the detriment of Class 10. This unequal treatment delays payment in full to Class 10 and increases the risk that they will not be paid in full at all.

### c. Interest Rates.

Debtor's Plan provides for interest on Tower's Class 3 claim at 14% (reduced to Key Bank's prime plus 2 ½% on the Plan's effective date) and on Key Bank's Class 7 claim at Key Bank's prime plus 2%. These claims are undersecured claims and would not be entitled to interest at the contract rate under a Chapter 7 liquidation. 11 U.S.C. §506(b); 11 U.S.C. §726(a)(5). Allowance of interest at these rates from the date of filing dramatically increases Tower and Key Bank's share of the unencumbered assets of the estate at the expense of Class 10. Under the Plan Tower's Class 3 claim is entitled to 54.1% of the distribution from unencumbered property and Class 10, 32.78%. Under Chapter 7 Tower's share would be 39.08% versus Class 10 share of 60.92%.

As a result of the Plan's discrimination, it is likely that Class 10 will not be paid out of the unencumbered assets of the estate. Rather Class 10 must look to the Plan's compensatory lien as a substitute for payment of any shortfall. This increases the risk that Class 10 will not receive full payment of its claims under the Plan as opposed to under Chapter 7.

It is generally recognized that interest rates should reflect the enhanced risk. In re Pluma, 303 B.R. 444 (9TH Cir. BAP 2003). The greater the risk of non payment the greater the interest rate. Here the creditors with the least risk of non-payment because they have security for their obligations are allowed the highest interest while the unsecured creditors of Class 10,

04-08560-JAR11    Doc 352    Filed 01/29/07    Entered 01/30/07 15:10:42    Pg 17 of 19

the creditors with the most risk of non payment, are allowed the lowest interest. The so called compensatory lien securing their position is behind Tower and Key Bank in their respective collateral. This stands the traditional view that greater risk equates with higher interest rates on its head.

### d. Enforcement of the Compensatory Lien.

There are ten creditors who are beneficiaries of the compensatory lien granted Class 10. The claims in this class range in amount from $2,944.00 to the $119,757.00 of Key Bank and total $280,805.00. There is no provision in the Plan as to what remedy is available to the members of Class 10 in the event of a default. Are they able to act alone or must they act in concert? How are decisions to be made by this Class? This is particularly important in that the largest member of this class, Key Bank, is in some instances ahead of Class 10's interests in the collateral. Key Bank's interests may conflict with the interests of the other members of Class 10.

The practical problems of enforcing this compensatory lien are fraught with uncertainties. Its impracticality diminishes the economic value of the compensatory lien. This lien does not compensate Class 10 for the risk of non payment.

## V. CONCLUSION

The terms of Debtor's Plan diminish the likelihood that Class 10 will be paid in full plus the interest to which they would be entitled to in a Chapter 7. The additional interest and compensatory lien provided by the Plan do not compensate Class 10 for the enhanced risk of non-payment. Although it is possible that Class 10 would be paid in full plus interest under the Debtor's Plan it is not probable, given the delay in payment and the reliance on a compensatory lien of questionable value. The Debtor's Plan is not in the best interests of the Class 10 creditors. Debtor's Plan should not be confirmed.

This memorandum opinion will constitute the courts findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

The Court will issue an order denying confirmation accordingly.

Done this 29 day of January, 2007.

_____
Bankruptcy Judge

Memorandum Opinion
January 29, 2007                    19